NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES, | : | Hon. Faith S. Hochberg |
| Plaintiff, | : | Criminal No. 09-195 (FSH) |
| v. | : | **OPINION & ORDER** |
| OLIVER CHUKWUMA, | : | Date: March 1, 2010 |
| Defendant. | : | |

**HOCHBERG, District Judge:**

On November 24, 2009, a jury convicted Defendant Oliver Chukwuma of conspiracy to commit bank fraud (Count One), corruptly demanding a bribe (Count Two), and money laundering (Counts Three through Five). Defendant now moves for a judgment of acquittal on Count One, and for a new trial on all Counts. The Court has considered the arguments of the parties on the papers pursuant to Federal Rule of Civil Procedure 78.

**BACKGROUND**

This matter arises out of Defendant's employment as a construction project manager at two different banks. As a project manager, Defendant was responsible for hiring contractors to perform capital improvement projects at bank facilities, supervising the contractors' work, and, upon completion of the work, approving payment of the contractors' invoices. The Indictment alleges that Defendant abused his position for personal gain by executing two separate illicit

schemes.

The first scheme, charged in Count One of the Indictment, was to defraud Fleet Bank through the submission of false invoices. In support of Count One, the Government introduced the testimony of various Fleet Bank employees, as well as Jack Lubin, a contractor who performed construction and maintenance work for the Bank, and who pled guilty to participating in the conspiracy. Lubin testified that he and Defendant agreed that Lubin would submit inflated and false invoices to Fleet Bank for work that he had not performed. Defendant personally approved the payment of Lubin's invoices, despite knowing that Lubin had not performed the work. Lubin then paid Defendant, in cash and in kind, approximately-one half of the after-tax proceeds. Over a period of about two years, Lubin submitted, and Defendant approved, more than 200 inflated and false invoices totaling over $1,000,000.

Other Fleet project managers testified that they discovered Defendant's scheme when Lubin's invoices were billed and paid out of their closed project accounts. Defendant's scheme specifically targeted projects that had come in under budget, because projects that were already complete, but that had leftover money in their budgets, could remain "open" to new invoices up to the budget maximum. Defendant used Fleet's computerized project management system to identify such projects, and provided project numbers and locations to Lubin with directions to use the information to prepare the false invoices.

The Government introduced several hundred documentary exhibits corroborating Lubin's testimony about the mechanics of the scheme, including the fraudulent invoices themselves, which bear Defendant's signature approving payment, and, in some cases, show notations changing project numbers and locations. (Exhibits 100-385). The exhibits also included

Defendant's handwritten and typewritten instructions for preparing the fraudulent invoices (Exhibit 501 *et seq.*). For example, exhibits in Defendant's handwriting (which was identified by Lubin and David Agnew, Defendant's close friend of 20 years) provided the project numbers and project locations to list on the invoices, dictated the prices to be charged to Fleet and whether or not to include tax (*e.g.*, Exhibit 525), and instructed that certain invoices be backdated (*e.g.*, Exhibit 507). Other exhibits in Defendant's handwriting showed Defendant tracking the proceeds of the fraud, deducting percentages for the payment of taxes, dividing the post-tax proceeds by two, and deducting certain cash and in-kind payments from the balance owed (Exhibits 502, 503, 510).

The Government also introduced Fleet Bank records showing that many of the fraudulent invoices billed for projects that were already closed and/or that contained leftover budget money, or were for work at Fleet facilities at which Defendant was not the assigned project manager, and therefore, had no authority to approve payment for such work (*e.g.*, Exhibits 700, 701, 702). Defendant's colleagues at Fleet Bank testified that the work described in the invoices that Defendant had approved had not been done and, in some instances, could not have been done. For example, one invoice was for renovations to the second floor of a one-story building; another was for parking lot repairs at a facility where Fleet Bank was not responsible for parking lot maintenance.

Additionally, the Government introduced records that corroborated Lubin's testimony concerning in-kind payments that he made to Defendant, including photographs of the work Lubin performed on Defendant's house (Exhibits 1-16), and merchant records of purchases Lubin made on Defendant's behalf (Exhibit 900 *et seq*). The Government also offered the

testimony of Stephen Wangboje, the owner of a freight services company, who testified that Lubin paid him for shipping and storage charges incurred by Defendant and his wife.

The Government also presented the testimony of Donald Harris, Defendant's supervisor at Fleet Bank, who described how Fleet managers chanced upon the fraud. Mr. Harris testified that when he confronted Defendant about the false invoices, Defendant did not dispute that the work described on some of the invoices had not been done. Defendant further responded that he "didn't get anything out of this," and that he "didn't mean to hurt" anyone. Fleet Bank suspended Defendant and ultimately terminated his employment.

Defendant's second scheme, charged in Counts Two through Five of the Indictment, occurred during his tenure as a project manager at Valley National Bank. Defendant obtained this position shortly after being terminated from Fleet Bank via an employment application that was designed to prevent Valley National Bank from contacting individuals at Fleet who would have been likely to reveal the misconduct for which Defendant had been fired. At Valley National Bank, Defendant was responsible for hiring contractors to complete construction work at Valley facilities in New York City. One of the Valley National Bank contractors was a construction company operated by Sam Kwan. Kwan testified that Defendant approached him and demanded a $20,000 cash payment from Kwan's company as a condition of the company remaining eligible to bid on future Valley National Bank construction projects. Kwan's testimony regarding this encounter with Defendant was corroborated by his business partner, Ed Lewis, who described Kwan's concern and dismay about Defendant's demand for a bribe, and their decision to accede to Defendant's demand.

Kwan further testified that he paid the bribe as directed by Defendant: Defendant

4

provided Kwan with a $20,000 invoice for architectural services from a company called DCDA Design Services, Inc., which was owned by Defendant's long time close friend, David Agnew. Kwan then mailed a $20,000 check made payable to DCDA Design Services to Agnew's attention. Agnew testified that pursuant to Defendant's direction, he issued the false invoice to Kwan's company and deposited Kwan's check into his company bank account. After Agnew deposited the bribe proceeds, he again followed Defendant's instructions and wrote three checks to Defendant in the amounts of $10,000, $5,000 and $4,500; Agnew testified that Defendant allowed him to keep the remaining $500 for his efforts. The testimony of these witnesses was corroborated by documentary evidence offered by the Government, which included the false invoice issued by DCDA Design Services, Kwan's check made payable to DCDA Design Services, and the three checks from DCDA Design Services made payable to Defendant (Exhibits 61, 62, 64, 67).

      The Defendant did not testify in his defense. He presented the testimony of his wife, Gloria Chukwuma, who testified that Lubin did work at their home because he needed the money. During summation, Defense counsel described Defendant as merely negligent, arguing that he approved the false invoices at Fleet Bank without knowing that they were fraudulent. Counsel also fervently attacked the credibility of the Government's witnesses. This attack focused particularly on Lubin, describing his whole life as a fraud, and arguing that his testimony was "a tale to avoid jail." Counsel depicted Lubin as a habitual liar and a gambler, with a son suffering from drug abuse, and contended that Lubin could not have made cash payments to Defendant, as he had testified, because Lubin had spent the proceeds of the fraud on his gambling and his son's rehabilitation.

The Government made a short rebuttal summation, which focused on rebutting Defendant's claim that he was not aware of the fraud at Fleet Bank, and on rehabilitating Lubin's credibility. During the rebuttal, the Government made the following statement, which is at issue here:

> [Defense counsel] talked about Jack Lubin. This is a two person conspiracy ladies and gentlemen. The defendant and Jack Lubin. Jack Lubin offers that unique perspective and by unique there is only one other person who can testify in a two person conspiracy, the other coconspirator.

Counsel for Defendant immediately objected. The Court sustained the objection and called for a sidebar. At sidebar, Defense counsel moved for a mistrial, arguing that the comment was a direct remark on Defendant's decision not to testify in violation of the Fifth Amendment. After hearing both sides' arguments, the Court denied the motion. Immediately following the sidebar, the Court gave a pointed curative instruction to the jurors:

> Ladies and gentlemen, I'm directing you to disregard what the Assistant United States Attorney just said a moment ago. The defendant did not testify in this case, a defendant has an absolute constitutional right not to testify, and you must not attach any significance to the fact that the defendant did not testify, and you must not draw any adverse inference against the defendant because he did not take the witness stand.

During the jury charge shortly thereafter, the Court gave the Third Circuit model instruction:

> Defendant Oliver Chukwuma did not testify in this case. A defendant has an absolute constitutional right not to testify. The burden of proof remains with the prosecution throughout the entire trial and never shifts to a defendant. The defendant is never required to prove that he is innocent. You must not attach any significance to the fact that Oliver Chukwuma did not testify and you must not draw any adverse inference against him because he did not take the witness stand. Do not consider for any reason at all the fact that Oliver Chukwuma did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way.

The Court also admonished the jury to base its verdict only upon the evidence presented at trial, and directed that the statements and arguments of counsel do not constitute such evidence. Finally, the Court reminded the jury that it "must not consider or be influenced in any way" by any statements the Court instructed it to disregard; rather, it must "act as if such statements were never said." The Court used the challenged comment as an example:

> [D]uring rebuttal summation I told you to disregard a comment of the Assistant United States Attorney. That is to be completely disregarded by you. That is an example of the kinds of things that you must follow when I give you instructions on the law. If I tell you to disregard a statement, you must completely put it out of your mind.

The jury retired to deliberate at approximately 12:50 p.m. At approximately 3:05 p.m., after a lunch break, a courthouse-wide fire drill that required everyone, including the jury, to vacate the building and remain on the street for about a half hour, and a period of deliberations, the jury returned guilty verdicts on all Counts of the Indictment. In the very brief period that the jury was deliberating, the Court invited the Defense to renew its motion for a new trial. In the midst of that discussion, the jury announced that it had reached its verdict.

## DISCUSSION

### I. Motion For A New Trial

It is well established that a comment by a prosecutor on a defendant's failure to testify violates the defendant's Fifth Amendment right to remain silent. *Griffin v. California*, 380 U.S. 609, 614 (1965). The test for determining whether an indirect remark was directed to a defendant's failure to testify is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it be a comment on the failure of the accused to testify." *Bontempo v. Fenton*, 692 F.2d 954, 959 (3d Cir. 1982).

Here, although it was certainly not intended as such, the Government's statement during its rebuttal summation that "there is only one other person who can testify in a two person conspiracy, the other coconspirator," could reasonably be misunderstood as a comment on Defendant's silence at trial. Although the Assistant United States Attorney believed that he was describing Lubin as "the other coconspirator," the jury could have understandably mistaken those words – "the other coconspirator" – as a reference to Oliver Chukwuma. The Court credits the Government's explanation that the prosecutor was attempting to meet Defendant's attacks on Lubin's credibility by observing that there were no other witnesses, besides Lubin, who the Government could have called to explain the mechanics of the false invoice scheme; the Government, therefore, had to present Lubin's testimony, despite his personal shortcomings. However, the disputed remark did not convey this message clearly enough, and instead, through an inartful choice of phrasing, could have come across as a comment on Defendant's choice not to testify.

This is a constitutional error, albeit not a willful or deliberate one.[1] When a constitutional error occurs, a jury's guilty verdict will be set aside unless the constitutional error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 22-24 (1967); *see also United States v. Hasting*, 461 U.S. 499, 509 (1983) ("it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations"). In assessing harmlessness, "[t]he question a reviewing court must ask is this: absent the prosecutor's [improper comments], is it clear beyond a reasonable doubt that the jury would

---

[1] It was clear to this Court that, until the Assistant United States Attorney was actually standing at the sidebar, he did not realize the manner in which his words could have been taken as a comment about Defendant, rather Lubin.

have returned a verdict of guilty?" *Hasting*, 461 U.S. at 510-11. In determining the prejudicial effect of the error, the Court considers "in context and in light of the entire trial, the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001). The Government bears the burden of proving that the error was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24.

### A. Counts Two Through Five

In the instant case, the improper remark was not in any way directed at the evidence offered to prove Counts Two through Five. As Defendant had previously argued in his motion to sever Counts Two through Five, these Counts are "separated by time, place, character and the proofs" from Count One. First, these Counts do not involve a conspiracy, which was the entire content and import of the prosecutor's remark. Second, these Counts do not involve Fleet Bank, which was the only bank victimized by Lubin and Defendant's false invoice scheme. Rather, Counts Two through Five relate to a completely separate set of acts by Defendant, who demanded a bribe from a different contractor (Sam Kwan) at a different bank (Valley National Bank) and then laundered the proceeds of the bribe through another individual (David Agnew). Jack Lubin had nothing to do with this bribery and money laundering scheme, which, notably, was not charged as a conspiracy. Further, no testimony about this scheme came from Jack Lubin, who was not involved with Valley National Bank or its contractors. In short, the challenged comment referred only to the conspiracy between Defendant and Lubin charged in Count One, whose object was to defraud Fleet Bank; it could not logically or reasonably have tainted the jury's consideration of the evidence submitted on Counts Two through Five.

9

In addition, the evidence of Defendant's guilt on Counts Two through Five was overwhelming. *See United States v. Perez*, 870 F.2d 1222, 1229 (7th Cir. 1989) (finding prosecutor's comment to be error, but ruling error harmless beyond a reasonable doubt "given the compelling evidence" against defendants). As outlined in detail above, Sam Kwan testified, without significant impeachment, that Defendant demanded a $20,000 bribe from his company in exchange for remaining on Valley National Bank's bid list. This testimony was corroborated by Kwan's business partner who testified, without serious impeachment, that Kwan returned from a meeting with Defendant and reported that Defendant had demanded a bribe. Kwan and Agnew testified to the carefully constructed manner in which the bribe was paid to Defendant; their testimony was bolstered by the paper trail admitted into evidence, which included the false invoice Agnew issued to Kwan's company; the $20,000 check made payable and mailed by Kwan to Agnew's company; and the three checks from Agnew's company made payable to Defendant. In light of this overwhelming evidence, and the fact that the prosecutor's statement was directed only to the conspiracy with Lubin, the prosecutor's error was harmless beyond a reasonable doubt with respect to Counts Two through Five.

### B. Count One

Although it related to the conspiracy charged in Count One, the remark was not intended to and did not emphasize Defendant's silence, nor did it imply guilt from Defendant's silence. It was meant to explain why the Government called Lubin, despite his many flaws. It was isolated within a longer rebuttal following nearly two hours of summation, and it was neither the first nor the last argument that the jury heard. *See United States v. Inzunza*, 580 F.3d 894, 909 (9th Cir. 2009) (ruling prosecutor's improper comment to be harmless beyond a reasonable doubt where it

did not "stress an inference of guilt from silence," was isolated within the rebuttal, and "was not close to the last thing the jury heard"); *United States v. Rahseparian*, 231 F.3d 1267, 1276 (10th Cir. 2000) (finding prosecutor's comment to be harmless error beyond a reasonable doubt where, *inter alia*, it was a single reference in a lengthy closing following multiple days of testimony).

Moreover, the comment was followed by an immediate and unequivocal curative instruction from the Court, which directed the jury to disregard the statement. This pointed instruction was repeated, in even stronger terms, during the jury charge, which included a direction that no adverse inference was to be drawn against Defendant for exercising his right not to testify. *See United States v. Soudan*, 812 F.2d 920, 931 (5th Cir. 1986) (prosecutor's comment harmless error beyond reasonable doubt in light of strong instruction to jury on defendant's right to remain silent). The charge also included an admonishment that the jury should base its verdict on the evidence presented, and that statements and arguments of counsel are not such evidence. *See Rahseparian*, 231 F.3d at 1276 (finding prosecutor's comment harmless beyond reasonable doubt in light of jury instructions on limiting deliberations to only evidence presented and on burden of proof). The Court also instructed the jury that it must not consider or be influenced in any way by statements the Court instructed it to disregard, using the challenged comment as an example. There is no reason to think that the jury did not follow these instructions. *See, e.g.*, *United States v. Hakim*, 344 F.3d 324, 326 (3d Cir. 2004) ("We generally presume that juries follow instructions given by the District Court, and the time lapse between the testimony and the curative instruction here was not long enough to overcome that presumption.").

Finally, and most importantly, there was overwhelming evidence of Defendant's guilt on Count One. *United States v. Triplett*, 195 F.3d 990, 997 (8th Cir. 1999) (finding prosecutor's

11

comment to be harmless error beyond reasonable doubt because of "the substantial amount of properly-admitted evidence" of defendant's guilt). The documentary exhibits offered into evidence demonstrated to the jury, in Defendant's own handwriting,[2] that the false invoice scheme was conceived, directed, and executed by Chukwuma. The documents show Defendant's handwritten instructions to inflate invoices by specific amounts and to backdate other invoices, his handwritten notations changing project numbers, and his calculations tracking the proceeds of the fraud, deducting percentages for the payment of taxes, and dividing the remainder by two. Witness testimony by other Fleet Bank employees further revealed that Defendant exploited Fleet Bank's project management system – a system that he, not Lubin, had access to and was familiar with – to identify closed projects with excess, untapped funds. The evidence of Defendant's guilt was further bolstered by the hundreds of thousands of dollars of cash and in-kind payments Defendant received from Lubin to effect the split of the proceeds, documented by the various merchant records, and described by Lubin and Wangboje.

Given the scores of false invoices, coupled with instructions in Defendant's own handwriting dictating the prices, taxes, and project numbers to be put on the invoices, the jury reasonably rejected the defense that Chukwuma was just a beleaguered bank employee who inadvertently approved some false invoices submitted by Lubin. Rather, the evidence showed an unequivocal pattern to defraud Fleet Bank in an intelligent, shrewd, and organized way by Chukwuma, a skilled architect. In light of this abundant and compelling evidence against Defendant, the Court finds that the prosecutor's error was harmless beyond a reasonable doubt.

---

[2] Notably, the proof of Defendant's handwriting was made by Agnew, Defendant's long time close friend, who, as described above, testified about how Defendant involved him in the money laundering scheme.

Therefore, a new trial will not be ordered.

## II. Motion For Rule 29 Judgment Of Acquittal On Count One

Defendant has moved for a judgment of acquittal solely on Count One. A judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is only appropriate if "no reasonable jury could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987). Defendant bears this "very heavy burden." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). Defendant argues that no rational juror could believe Lubin when he testified that Defendant directed him to prepare the fraudulent invoices and share the proceeds of the fraud. However, as the foregoing discussion amply demonstrates, the Government corroborated Lubin's testimony through the voluminous and substantial documentary evidence as well as through the testimony of many other witnesses. A reasonable jury could accept this evidence as sufficient to support a finding of guilt beyond a reasonable doubt.

Accordingly, for the foregoing reasons,

**IT IS** on this 1st day of March 2010,

**ORDERED** that Defendant's Motion [Docket No. 53] is **DENIED**.

      /s/ **Faith S. Hochberg**  
      Hon. Faith S. Hochberg, U.S.D.J.